IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **BYSIL DOE** | : | **No. 18-315-11** |

## MEMORANDUM

PRATTER, J.                                                                                                              AUGUST ___, 2020

Bysil Doe seeks temporary pretrial release pursuant to 18 U.S.C. § 3142(i). The primary basis for his motion is the COVID-19 pandemic and his concerns regarding his health and his ability to prepare his defense.[1] The Government disputes the motion. The Court held an evidentiary hearing and heard oral argument regarding Mr. Doe's motion. At the hearing, Mr. Doe also moved in the alternative for reconsideration of the magistrate judge's original bail determination.

For the reasons that follow, the Court denies Mr. Doe's request for pretrial release.

### BACKGROUND

**I.**     **Mr. Doe's Criminal Conduct**

Mr. Doe has been charged as one of 20 defendants for his alleged participation in the Hilltop Drug Trafficking Group, an organization supposedly responsible for multiple heroin overdose deaths. Mr. Doe is accused of being one of the "runners," which means he was responsible for delivering narcotics to customers and collecting payment. Records of prison phone

---

[1] At the time Mr. Doe filed the motion, he also requested pretrial release because his mother had been hospitalized and he was unable to communicate with her. Fortunately, Mr. Doe's mother has since recovered and is no longer hospitalized. Accordingly, Mr. Doe's arguments based upon her hospitalization are moot.

1

calls and government wiretaps purport to have captured more than a hundred conversations between Mr. Doe and various Hilltop leaders, including Michael Harris, discussing the Group's operations. Mr. Doe is alleged to have sold heroin to an undercover DEA agent in December 2015. In April 2017, Mr. Doe was stopped by Philadelphia police and found to be carrying a backpack containing heroin, Xanax, and a loaded firearm.

Mr. Doe stipulated to pretrial detention and has been detained at the Federal Detention Center in Philadelphia since September 2017. If convicted of the crimes with which he is charged, Mr. Doe faces a mandatory minimum of 20 years of imprisonment and a maximum possible life sentence.

Mr. Doe previously was convicted in 2014 of distribution of heroin and conspiracy in the Delaware County Court of Common Pleas. He was sentenced to 15–36 months' incarceration followed by two years of probation. Mr. Doe was released and on supervision for this offense when he allegedly committed the crimes with which he is presently charged here in federal court.

## II.    Mr. Doe's Health Concerns

Mr. Doe says he was born with a heart murmur and has suffered from childhood asthma, requiring an asthma pump during adolescence. He has submitted four sworn declarations from friends and family in support of his description of his medical conditions. The Court has not received any actual medical records for Mr. Doe. However, Mr. Doe's counsel represented to the Court at the evidentiary hearing that Mr. Doe's health records at the FDC do not reflect any prescriptions for Mr. Doe or documentation that Mr. Doe suffers from any conditions that would put him at high risk for COVID-19.

### III. The FDC's Response to the COVID-19 Pandemic[2]

Because "maintaining safety and security of [BOP] institutions is [BOP's] highest priority,"[3] BOP has taken significant measures to protect the health of the inmates in its charge. BOP's Pandemic Influenza Plan has been in place since 2012. BOP HEALTH SERVICES DIVISION, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf (last visited August 18, 2020). The protocol set forth in this plan established a multi-phase framework which requires BOP facilities to begin preparations in the face of a "[s]uspected human outbreak overseas." *Id.* at i. This plan further addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

BOP began planning for potential transmissions related to COVID-19 as early as January 2020, during the same time in which it established a working group to develop COVID-19 policies. In accordance with the Coronavirus (COVID-19) Action Plan, BOP began to modify its operations to minimize the risk of COVID-19 transmissions. Every BOP institution requires all inmates to be secured in their assigned cells/quarters. Limited group gathering, with social distancing to the extent possible, is permitted to facilitate commissary, laundry, showers, telephone, and computer access. BOP is working to distribute face masks to all staff and inmates and encourages face coverings be worn in public spaces when social distancing is not feasible. Excluding medical

---

[2] For several months the Court and many judicial colleagues in this District have received many motions which have necessitated a review of past and contemporaneous responses by the BOP and the FDC to the COVID-19 pandemic. The Court's discussion here reflects the oft-repeated recitation of public information and the most current information concerning applicable conditions.

[3] BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited August 18, 2020).

3

treatment and similar exigencies, BOP has substantially limited the movement of inmates and detainees among its facilities. Official staff travel has also been cancelled, as has most staff training other than on-line efforts.

Newly admitted inmates are screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates are placed in quarantine for at least 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting the Centers for Disease Control and Prevention's (CDC) criteria for release from isolation. All facility staff are screened for symptoms in areas with sustained community transmission. Staff members who exhibit a fever of higher than 100.4 degrees Fahrenheit are barred from entering the facility. Similarly, staff members with a stuffy or runny nose can be placed on leave. Only contractors performing essential services or the necessary maintenance on essential systems may enter BOP facilities. Moreover, all volunteer visits have been suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer entering BOP facilities will be screened for symptoms and risk factors. As of March 13, 2020, social and legal visits were suspended, with facilities permitting only case-by-case accommodations for visiting attorneys after the attorney has been screened for infection. BOP has increased telephone minute allowances to counteract these limits on in-person interactions. Legal visits have subsequently resumed under closely monitored protocols.

As directed by the Attorney General, BOP is also prioritizing the use of statutory authority to place eligible prisoners in home confinement.[4] Pursuant to the Coronavirus Aid, Relief, and Economic Security Act, BOP may also "lengthen the maximum amount of time for which the

---

[4] This authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and to move elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g) to home confinement.

4

Director is authorized to place a prisoner in home confinement" in the event the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). As of the date of this Memorandum, BOP has transferred more than 7,000 inmates to home confinement since March 26, 2020.

Notwithstanding the care taken to reduce risks, some inmates and staff personnel at various BOP institutions have become ill. As of July 22, 2020, the date the Government filed a supplemental letter providing updates on the FDC's response to COVID-19, five FDC inmates have tested positive at the FDC. However, these inmates tested positive during the automatic 14-day quarantine for new arrivals. There have not been any known positive cases of COVID-19 in the local FDC general inmate population. Out of the five new arrivals to test positive, three have recovered, one is in isolation, and one was released at the completion of his sentence while still quarantined. Five staff members also tested positive for the virus, three of whom have since returned to health. The other two are not permitted to return to work at the FDC until they are recovered.

## LEGAL STANDARD

### I.  Temporary Release Under 18 U.S.C.A. § 3142(i)

Section 3142(i) provides, in part, that "[a] judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." "The defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i)." *United States v. Veras*, No. 19-010, 2020 WL 1675975, at *3 (M.D. Pa. Apr. 6, 2020).

"In light of the COVID-19 pandemic, Section 3142(i)'s potential applicability is clear, but whether relief is warranted under that Section is considered on a case-by-case basis." *United States v. Gongda Xue*, No. 18-122, ___ F. Supp. 3d ___, 2020 WL 2307339, at *5 (E.D. Pa. May 8, 2020):

> While there has been some discrepancy among courts about how these requests should be resolved, two guiding tenets have emerged. First, Section 3142(i) motions must be considered within the larger context of the requirements of the Bail Reform Act. Second, the generalized risk of COVID-19 is not, in and of itself, a sufficient reason to justify release. Thus, resolving Section 3142(i) motions requires an individual assessment of the movant's characteristics and circumstances in light of these two considerations.

*Id.*

In considering the larger context, "[t]he fundamental precept of the Bail Reform Act mandates the release of individuals so long as the court can be reasonably assured the defendant does not pose a flight risk or danger to the community." *United States v. Holland*, No. 10-243, 2020 WL 4260757, at *2 (M.D. Pa. July 24, 2020) (citing 18 U.S.C. § 3142). Therefore, the Court must assess whether conditions can be fashioned to assure that the person charged does not pose a flight risk or a danger to the community. *See United States v. Carter*, No. 18-561-1, 2020 WL 3412571, at *6 (E.D. Pa. June 22, 2020) (citing 18 U.S.C. § 3142). In assessing these conditions, "courts are directed to consider the factors enumerated in 18 U.S.C. § 3142(g)." *Id.* These factors include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, health condition, community ties, resources, past conduct, and whether the person was on probation, parole, or other release at the time of the current offense or arrest; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4).

"In addition to these factors, the Bail Reform Act also requires district courts to weigh release decisions against certain statutory presumptions, including a presumption in favor of detainment for defendants charged with violent crimes or serious drug trafficking offenses." *Carter*, 2020 WL 3412571, at *6. Subject to rebuttal, there is a statutory presumption that no condition or combination of conditions will reasonably assure the appearance of the person or the safety of the community if the Court finds that there is probable cause to believe that the person committed one of the offenses enumerated in 18 U.S.C. § 3142(e)(3). The Third Circuit Court of Appeals has held that "[an] indictment is sufficient to support a finding of probable cause triggering the rebuttable presumption of dangerousness under § 3142(e)." *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

"Cast against this comprehensive statutory scheme prescribing the procedure for making initial bail and detention decisions, § 3142(i) constitutes a limited safety valve provision, enabling courts to re-examine detention decisions 'to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.'" *United States v. Washington-Gregg*, No. 19-331, 2020 WL 1974880, at *5 (M.D. Pa. Apr. 24, 2020) (quoting 18 U.S.C. § 3142(i)). In the wake of COVID-19, "this re-examination does not take place in isolation," and courts have also evaluated the following factors:

> (1) the specificity of the defendant's stated COVID-19 concerns, (2) the original grounds for the defendant's pretrial detention, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

*Carter*, 2020 WL 3412571, at *6 (listing cases). "The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a 'compelling reason' exists such that temporary release is 'necessary.'" *United States v. Denmark*, No. 19-15, 2020 WL 1984306, at *6 (M.D. Pa. Apr. 27, 2020).

Turning to the second tenet of motions under 18 U.S.C. § 3142(i), and the one that Mr. Doe relies on, "courts have generally 'rejected emergency motions for release . . . based solely on the generalized risks that COVID-19 admittedly creates for all members of our society.'" *Carter*, 2020 WL 3412571, at *6 (quoting *Denmark*, 2020 WL 1984306, at *6). "Rather, at a minimum, courts have typically required proof of a defendant's particular vulnerability to the disease in order to constitute a compelling reason for release under § 3142(i)."[5] *Id.*

## II. Reconsideration of Magistrate Judge's Pretrial Detention Determination

A district court reviews a magistrate judge's pretrial detention determination *de novo* and reaches an independent conclusion regarding the defendant's eligibility for release on bail. *See United States v. Delker*, 757 F.2d 1390, 1394–95 (3d Cir. 1985). "Bail is to be determined in accordance with the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*" *United States v. Evans*, No. 15-423, 2015 WL 6750769, at *1 (E.D. Pa. Nov. 4, 2015). Under 18 U.S.C. § 3142, the Court should release a defendant unless there are no conditions that will reasonably assure his appearance for subsequent court proceedings and the safety of the community. *Id.* (citing 18 U.S.C. §§ 3142(e), (f)). Accordingly, because the Court must weigh the same factors in considering whether such conditions exist, the *de novo* bail analysis parallels the analysis for temporary pretrial release under 18 U.S.C.A. § 3142(i).

## DISCUSSION

Mr. Doe requests temporary pretrial release because the COVID-19 pandemic poses unique threats to his health and hinders his ability to prepare his defense. He asserts that his history of a

---

[5] Our court of appeals has endorsed this approach in similar contexts evaluating whether COVID-19 may constitute a compelling reason for release. *See, e.g., United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.")

heart murmur and his childhood asthma both increase his risk of serious illness or death from COVID-19. Mr. Doe also contends that the conditions of the FDC's response to COVID-19 have prevented him from viewing the discovery in his case, and the FDC's limitations on attorney visits have severely limited the preparation of his defense. He claims that pretrial release would enable him to prepare his defense through regular telephone calls and videoconferences with counsel.

Before addressing the arguments and the evidence, it once again bears recognizing the unprecedented magnitude of the COVID-19 pandemic. Indeed, to the extent correctional facilities may have successfully dealt with past viruses and outbreaks of communicable diseases, those diseases pale in scope with the apparent magnitude and speed of transmission of COVID-19 and the challenges associated with it. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency and states of emergency by many states, along with various forms of business closures or modifications to operations and stay-at-home orders. Without known effective treatment at this time, and vaccines months (or more) away, public health officials urge people to practice "social distancing,"[6] frequent and thorough hand-washing, avoidance of close contact with others, and wearing masks during public interactions—all of which are understandably difficult to implement in a correctional or detention facility. Certainly, the Court takes this critical health risk seriously. But as concerning as the common calamity of COVID-19 is, resolving Mr. Doe's motion still calls upon the Court to seriously take into consideration the limits imposed pursuant to 18 U.S.C. § 3142 and the Bail Reform Act as a whole.

Turning to the merits of Mr. Doe's motion, Mr. Doe first contends that having been born with a heart murmur and suffering from childhood asthma are compelling reasons for his release

---

[6] Some have understandably suggested that this would be better thought of as "physical distancing," insofar as it is also strongly urged that maintenance of social interaction remains important for purposes of counteracting the negative emotional aspects of isolation.

because he is at a higher risk of suffering severe illness or death should he contract COVID-19. The Court cannot agree with Mr. Doe's prognosis.

The CDC advises that "serious heart conditions," specifically heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension, increase the risk of severe illness from COVID-19. *See* CDC, *Serious Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited August 18, 2020). A heart murmur does not fall into one of these categories. Although the CDC recognizes that "[h]aving other cardiovascular or cerebrovascular disease . . . may increase [the] risk of severe illness from COVID-19," *id.*, such other cardiovascular diseases are not considered high risk. Furthermore, the Court does not have any evidence before it that Mr. Doe's heart murmur produces any present health concerns.

As for Mr. Doe's childhood asthma, the CDC recognizes only "moderate to severe asthma" as a possible risk factor for COVID-19. *See* CDC, *People with Moderate to Severe Asthma*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited August 18, 2020). Pursuant to the National Asthma Education and Prevention Program, an individual suffers from moderate persistent asthma if any of the following is true:

- Symptoms occur daily. Inhaled short-acting asthma medication is used every day.
- Symptoms interfere with daily activities.
- Nighttime symptoms occur more than 1 time a week, but do not happen every day.
- Lung function tests are abnormal (more than 60% to less than 80% of the expected value), and PEF [peak expiratory flow] varies more than 30% from morning to afternoon.

UNIVERSITY OF MICHIGAN, *Classification of Asthma*, available at https://www.uofmhealth.org/health-library/hw161158 (last visited August 18, 2020).

Even if Mr. Doe's asthma qualified as moderate to severe during his adolescence, all the evidence before the Court demonstrates that Mr. Doe no longer suffers from any asthma-related symptoms. It is undisputed that Mr. Doe does not take any asthma medication at this time. Therefore, the Court must conclude that Mr. Doe does not now, in the time of COVID-19, suffer from an asthma-related risk.

Because the CDC does not recognize either of Mr. Doe's self-described medical conditions as high risk, the Court concludes that Mr. Doe has failed to produce proof of his particular vulnerability to COVID-19. The Court is not trivializing Mr. Doe's health conditions, but "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify [] release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Accordingly, Mr. Doe is not entitled to relief on this ground.

As for Mr. Doe's claim relating to his ability, or claimed lack thereof, to prepare his defense, the Court finds that the same lack of individualized hardship once again bars relief. The Court acknowledges that institutions' efforts to quell the virus have, unavoidably, resulted in communication and collaboration difficulties between inmates and their counsel. However, these difficulties apply to every inmate in the FDC. The Court understands that the BOP and the FDC recognize the paramount importance of communicating with legal counsel and are making efforts to facilitate inmates' access to counsel. Many unfortunate hardships have been wrought by these times, but where circumstances necessitate that certain of these hardships be a communal burden, the Court cannot grant individual relief.

Regardless, even if the Court finds that Mr. Doe had demonstrated an individualized vulnerability to COVID-19 or inability to prepare his defense (something he has not yet demonstrated), the Court must also consider whether conditions could be fashioned to assure that

11

Mr. Doe does not pose a flight risk or a danger to the community. Mr. Doe's charges in the Superseding Indictment carry a cumulative mandatory minimum of 20 years of imprisonment and a maximum possible life sentence. Accordingly, these potential sentencing risks create a rebuttable statutory presumption that no conditions will reasonably assure his appearance in court or the community's safety. *See* 18 U.S.C. §§ 3142(e)(3)(A), (B).

It is Mr. Doe's burden to produce evidence to rebut this presumption. Here, Mr. Doe asserts that Pretrial Services data since 2009 demonstrates that only 2.9% of defendants considered in the highest risk category were re-arrested for a violent crime while on release. Because Mr. Doe only has one prior drug trafficking conviction and no prior violent convictions, Mr. Doe claims that he would not even fall into this "highest risk" category. He has also produced both sworn declarations and testimony at the July 20, 2020 hearing from friends and family members to demonstrate that he has strong ties to his family and the community at large. If released, Mr. Doe states that he could reside with his mother and stepfather at either one of two properties owned by his family.[7]

The Court recognizes the undeniable importance of strong familial and community ties and appreciates the support that family members have shown Mr. Doe. He is fortunate to know he has family champions. However, a person's family and community ties are only one factor to be considered under 18 U.S.C. § 3142(g). The statute also contemplates the nature and circumstances of the charges, the weight of the evidence, the person's past conduct, whether the person was on some form of release or supervision at the time of the current alleged offense or arrest, and the danger that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Here, Mr. Doe

---

[7] Mr. Doe also has a 17-year-old half-brother who resides with Mr. Doe's mother and stepfather. The Court expressed concern at the hearing over the possibility of Mr. Doe residing with a minor. The family subsequently represented to the Court that if Mr. Doe is released, he could reside with one parent in one of the family's homes while his younger step-brother would reside with the other parent in the second home.

is charged with conspiracy, drug distribution, intent to distribute drugs, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a felon. There simply is no disputing the seriousness of these charges. Mr. Doe has a prior conviction for heroin distribution and conspiracy. Of great concern to the Court is the fact that Mr. Doe was on state parole and probation related to that conviction at the time he allegedly committed the offenses with which he is charged here. Furthermore, although the Court acknowledges the strong ties Mr. Doe has to his family, Mr. Doe has committed at least one drug-related offense while residing with his mother. Therefore, the Court is unpersuaded that conditions exist that would guarantee he is not a flight risk or would not be a danger to the community. Proving that such conditions exist is a burden that lies with Mr. Doe, and the Court finds that he has failed to meet this burden.

Mr. Doe has not demonstrated compelling reasons justifying his release or that conditions exist that would assure he would not pose a flight risk or a danger to the community. Accordingly, he is not entitled to relief pursuant to 18 U.S.C.A. § 3142(i). For the same reasons he is not entitled to relief under 18 U.S.C.A. § 3142(i), the Court concludes in its *de novo* review of the bail determination that detainment was properly ordered.

## CONCLUSION

For the foregoing reasons, the Court denies Mr. Doe's request for pretrial release. An appropriate order follows.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE